Opinion for the court filed PER CURIAM. Opinion concurring in part and dissenting in part filed by Circuit Judge NEWMAN.
PER CURIAM.
Appeal and cross-appeal are taken from the judgment of the United States District Court for the District of Delaware.[1] Plaintiff Santarus, Inc. is the exclusive licensee of patents on specified formulations of benzimidazole proton pump inhibitors (PPI)— a class of chemical compounds that inhibit gastric acid secretion and help prevent and treat stomach acid-related diseases and disorders. The patents are for the inventions of Dr. Jeffrey Phillips, and are assigned to the University of Missouri. Santarus provides the PPI product omeprazole in the formulations covered by the Phillips patents, with the brand name Zegerid®.
Defendant Par Pharmaceutical, Inc. filed an Abbreviated New Drug Application (ANDA) for FDA approval to sell a generic counterpart of the Santarus Zegerid® products, invoking the Hatch-Waxman Act (the Drug Price Competition and Patent Term Restoration Act of 1984), which established a procedure called a “Paragraph IV certification,” 21 U.S.C. § 355(j)(2)(A)(vii)(IV), whereby an entity that seeks to market a generic counterpart of a patented drug product or method of use, before the patent has expired, may challenge the patent before actually marketing the drug. Thus the parties are here litigating the issues of infringement, validity, and enforceability of the Phillips patents.
The district court found that Par’s ANDA products infringe the Phillips patents, but held all of the asserted claims invalid on the ground of obviousness, 35 U.S.C. § 103. The court also held certain claims invalid on the ground of inadequate *1347 written description, 35 U.S.C. § 112. On the defense of unenforceability, the district court held that there was not inequitable conduct by Dr. Phillips, the University of Missouri, or their counsel in procuring the patents. Each side appeals the rulings adverse to it, except that Par does not appeal the finding of infringement. We conclude that the district court erred by holding that some of the thirty-six asserted claims would have been obvious over the prior art; these rulings are reversed. The court’s other rulings are affirmed.
I. The Phillips patents
Proton pump inhibitors affect the action of an enzyme within the stomach’s parietal cells, the cells within the membrane of the stomach that secrete hydrochloric acid. It was known that chemicals of the class of benzimidazoles have the property of inhibiting or inactivating this proton pump enzyme. The benzimidazoles operate by a mechanism whereby the benzimidazole PPI, upon ingestion or intravenous infusion, circulates in the bloodstream, from which it reaches and accumulates in the parietal cells and affects the proton pump enzyme. Hydrochloric acid secretion does not recover until the body produces a new quantity of the proton-producing enzyme. Several benzimidazoles have been approved by the FDA for PPI use, including products having the common names omeprazole (brand name Prilosec®), esomeprazole (Nexium®), lansoprazole (Prevacid®), rabeprazole (Aciphex®), and pantoprazole (Protonix®).
Although these PPIs are effective at blocking stomach acid production, they are extremely acid-sensitive. It was known that unprotected PPIs in the stomach’s acidic environment do not survive long enough to be absorbed into the bloodstream, and thus do not reach the parietal cells. To avoid this destruction, PPI products for oral ingestion were provided with an acid-resistant enteric coating, whereby the coated PPI passes safely through the stomach to the intestine, where the coating dissolves and the PPI is absorbed.
Before Dr. Phillips’s invention, all PPI products that were FDA-approved for oral administration had an enteric coating. In contrast, the Phillips products do not have an enteric coating. The products can be administered as liquid suspensions of the solid uncoated PPI together with a buffering agent, whereby the PPI is absorbed directly from the stomach into the bloodstream. This formulation has the advantages of rapid and consistent bioavailability and increased effectiveness, as well as ease of administration to patients unwilling or unable to swallow capsules or tablets. The Phillips patents explain:
in their current form (capsules containing enteric-coated granules or entericcoated tablets), proton pump inhibitors can be difficult or impossible to administer to patients who are either unwilling or unable to swallow tablets or capsules, such as critically ill patients, children, the elderly, and patients suffering from dysphagia.
U.S. Patent No. 7,399,772, col.7 1.65-col.8 1.4. The Phillips products “can alternatively be formulated as a powder, tablet, suspension tablet, chewable tablet, capsule, effervescent powder, effervescent tablet, pellets and granules.” Id. col.ll 11.50-53. The Phillips patents claim specific combinations of the uncoated benzimidazole PPI and buffering agents.
Par Pharmaceutical filed ANDA documents with the FDA, requesting permission to market the same formulations as the Zegerid® PPI, and describing the Par products as bioequivalent to the Zegerid® products marketed by Santarus. Par asserted unenforceability of all of the claims of the Phillips patents, and invalidity of the claims for which Santarus charged Par with infringement: U.S. Patent No. 6,489,- *1348 346 (the '346 patent) claims 26, 37, 38, 49, 50, .58, 59, 60, 66, 68, 80, 81, 82; U.S. Patent No. 7,399,772 (the '772 patent) claims 1, 4, 5, 8, 10, 12, 14, 15, 20, 21; U.S. Patent No. 6,780,882 (the '882 patent) claims 11, 12, 15, 27; U.S. Patent No. 6,699,885 (the '885 patent) claims 2, 9, 11, 15, 16, 17, 18, 41; and U.S. Patent No. 6,645,988 (the '988 patent) claim 29.
Each of the Phillips patents is a continuation or continuation-in-part in a chain that originated with Patent No. 5,840,737 (the '737 patent) based on a provisional application filed on January 4, 1996. The '737 patent describes the combination of the PPI and sodium bicarbonate, and states the broadest claim as follows:
1. A method for treating gastric acid disorders by administering to a patient a single dose of a pharmaceutical composition of omeprazole or lansoprazole in a pharmaceutically acceptable carrier consisting essentially of a bicarbonate salt of a Group IA metal wherein said administering step consists of providing to the patient orally a single dose of an aqueous solution or, suspension of the pharmaceutical composition without requiring further administration of the bicarbonate salt of the Group IA metal.
'737 patent claim 1.
The '346 patent is a continuation-in-part of the '737 patent, with an intervening abandoned application. Similar to the '737 patent, the '346 patent generally claims a method for treating an acid-caused gastrointestinal disorder comprising administering a solid pharmaceutical composition in a dosage form that is not enteric coated. See, e.g., '346 patent claim 24. The dosage consists of PPI and a buffering agent, and the claims specify certain ranges of PPI and buffer.
The '988 patent is a continuation-in-part of its predecessors. It includes a new Figure 5 showing the pH of gastroesophageal reflux disease and discusses the scientific mechanism of operation of the PPI. Only claim 29 is asserted. It recites a non-enteric coated solid oral pharmaceutical dosage form comprising approximately 5-300 mg of PPI and a buffer in an amount of 0.1-2.5 mEq per mg of PPI. '988 patent claim 29. The dosage form also includes a pharmaceutieally-acceptable excipient, indicating that it is a conventional dosage form such as a tablet, capsule, or granule. Id.
The other patents include additional limitations. For example, the '885 patent claims recite the serum concentration or blood level of PPI that is obtained within 30 minutes after administration. See, e.g., '885 patent claim 2. The '882 patent claims a stable powder for suspension, having a specified ratio of buffering agent to PPI, and a thickening agent. The composition recited in the '772 patent contains no sucralfate. '772 patent claim 1.
Par argues that every asserted claim would have been obvious over any one of several pieces of prior art. Par also argues that Dr. Phillips’s own '737 patent renders obvious those claims to which it is prior art. Finally, Par argues that all of the patents are unenforceable for inequitable conduct in the Patent and Trademark Office. We start with the issue of inequitable conduct, for this defense is asserted against all claims of all of the patents in suit.
II. Inequitable conduct
Par argues that all of the Phillips patents are unenforceable due to inequitable conduct by Dr. Phillips, the University of Missouri, and their attorneys, on the ground that they were tardy in informing the PTO that Dr. Phillips had made the uncoated PPI formulation and administered it to some hospital patients, and had informed medical colleagues and recorded the medication and its test results in hospi *1349 tal records, before the filing date of his first patent application. Par cites a “Critical Care Abstract” written by Dr. Phillips at St. Vincent’s Hospital, entitled “The Effect of Omeprazole/Sodium Bicarbonate Solution Administration on the Accuracy of subsequent pH Measurements Through the Nasogastric Tube.” This document reports his measurements of stomach acidity for these formulations.
Par charged that this test information and report should have been provided to the PTO during the prosecution of the first Phillips application, instead of during the prosecution of the second, continuing application. Par did not and does not argue that this information invalidates any patent, but argues that the disclosure to the PTO should have occurred during prosecution of the first-filed application, and that failure to do so renders unenforceable all of the patents.
Dr. Phillips testified that he was unaware that his experimental administration to patients and his measurement of the effect on stomach acidity required disclosure to the PTO. He testified that he had believed that only sale and public use were required to be disclosed, not experimental development, and that he had not intentionally withheld information or delayed its disclosure to the PTO. The University’s patent counsel testified that when he became aware of this test information he provided it to the PTO by Information Disclosure Statement during prosecution of the '346 application, which was the first continuing application, for the first application had already issued as a patent.
Par also stated that Dr. Phillips submitted a misleading declaration to the PTO regarding a “Carroll Abstract,” where, in response to an examiner’s rejection, Dr. Phillips submitted a declaration describing a test in which he crushed enteric-coated PPI and mixed the crushed pellets with a sodium bicarbonate solution; he declared that a suspension did not form, and provided a photograph of the test tube containing the crushed pellets. Par argued that Dr. Phillips distorted the study because he did not shake or swirl the crushed pellets with the sodium bicarbonate solution. Par’s expert testified that in his opinion it would take no more than five to ten minutes for the shaken suspension to become homogeneous; this opinion was not supported with evidence.
The district court found that Par had shown materiality of some of this information, and that the explanation by Dr. Phillips of why his test information was not initially provided to the PTO “strained credibility.” However, the court also found that “the evidence presented is not sufficient to establish by clear and convincing evidence that Dr. Phillips acted with an affirmative intent to deceive.” Santarus, 720 F.Supp.2d at 461. This finding is in accord with Therasense, Inc. v. Becton, Dickinson & Co., where this court explained that “[t]o prevail on a claim of inequitable conduct, the accused infringer must prove that the patentee acted with the specific intent to deceive the PTO.” 649 F.3d 1276, 1290 (Fed.Cir.2011) (en banc).
On this appeal Par stresses the district court’s remark of “strained credibility” and argues that this court should disbelieve Dr. Phillips, and that the only reasonable inference is that he and his legal representatives acted in bad faith and with intent to deceive. Santarus responds that the district court did not find any testimony false, and that intent to deceive was not established. We agree with the district court that intent to deceive was not shown by clear and convincing evidence. The district court’s ruling that inequitable conduct was not established is affirmed.
III. Validity
The district court invalidated the asserted claims of the '772 patent on the ground *1350 of inadequate written description and determined that the '772 claims are not entitled to claim priority to the application that issued as the '787 patent. The court also invalidated all of the asserted claims on the ground of obviousness over any of several prior art references. The court held that the '737 patent rendered obvious every claim to which it is prior art.
A. Written description
The written description issue relates to the inclusion of the clause “wherein the composition contains no sucralfate” in the claims of the '772 patent. This limitation is present in the sole independent claim of the '772 patent, claim 1, which recites:
A method for treating an acid-caused gastrointestinal disorder comprising the step of administering to a subject suffering from said disorder a solid pharmaceutical composition comprising:
(a) about lOmg to about 40mg of nonenteric coated omeprazole; and
(b) sodium bicarbonate in an amount of 0.2 mEq to 5 mEq per 2mg omeprazole;
wherein the composition contains no sucralfate, the acid-caused gastrointestinal disorder is selected from the group consisting of duodenal ulcer, gastric ulcer, gastroesophageal reflux disease, and erosive esophagitis, and the sodium bicarbonate is present in the composition in an amount sufficient to substantially prevent or inhibit acid degradation of at least some of the omeprazole by gastric acid upon administration to the subject.
'772 patent claim 1 (emphasis added).
The district court held that it is necessary for the '772 specification to include evidence demonstrating that sucralfate is “contraindicated,” in order to meet the written description requirement of § 112 ¶ 1. The court held that it is inadequate that the specification states that Phillips’s claimed composition is “advantageous” as compared with sucralfate, a product then commonly used to treat gastric ulcers and acid reflux. As a result, the court found that neither the priority applications, such as the application that issued as the '737 patent, nor the '772 specification support the “no sucralfate” limitation. Santarus, 720 F.Supp.2d at 444. For the same reasons, the court concluded that the asserted claims of the '772 patent are not entitled to claim priority to the '737 patent’s filing date. Id.
The '772 specification states that “H2 antagonists, antacids, and sucralfate ... have certain disadvantages associated with their use.... Proton pump inhibitors such as omeprazole represent an advantageous alternative to the use of H2 antagonists, antacids, and sucralfate as a treatment for complications related to stress-related mucosal damage.” 772 patent, col.7 11.62-65. The district court held that this statement is insufficient to meet the written description requirement, stating: “While this indicates that omeprazole is preferable to sucralfate, the same statements indicate with no less force that omeprazole is preferable to antacids such as sodium bicarbonate. Nonetheless, sodium bicarbonate, an antacid, is listed as the preferred carrier or buffer in the disclosed invention. Thus it cannot be true that the priority applications’ disclosure of the disadvantages of sucralfate, by itself, implies that its use is contraindicated.” Santarus, 720 F.Supp.2d at 443-44. The district court held that “consequently, the court finds that neither the priority applications nor the specification of the '772 patent support the no sucralfate limitation, for they do not show why a person of ordinary skill in the art reading the application would believe that sucralfate was ‘contraindicated’ in the claimed composition.” Id. at 444.
The '737 patent specification states that sucralfate, “possibly the ideal agent for *1351 stress ulcer prophylaxis, [citing references],” was known to have occasional adverse effects. '737 patent, col.3 11.14-15, 11.25-27 (“[T]he only patient whose death was attributed to stress-related upper gastrointestinal bleeding was in the sucralfate arm.... ”). Santarus argues that it is not necessary to include in the specification evidence of “contraindication” of sucralfate, and cites the testimony of Dr. Gilbert Banker, an expert witness for Santarus, who testified that a person of ordinary skill in this field would have known the properties and effects of sucralfate, and would have understood from the specification that disadvantages of sucralfate may be avoided by the Phillips formulation.
We agree. The claim limitation specifying that sucralfate is not administered in conjunction with the Phillips formulation restricted the claims to this preferred use of the Phillips formulations. This exclusion narrowed the claims, as the patentee is entitled to do. The Manual of Patent Examining Procedure explains that claims may state the exclusion of alternatives. See MPEP § 2173.05© (“If alternative elements are positively recited in the specification, they may be explicitly excluded in the claims.”). For example, in In re Johnson, 558 F.2d 1008, 1019 (CCPA 1977), the applicant narrowed the claims to exclude the content of a lost interference count, and the court observed that: “It is for the inventor to decide what bounds of protection he will seek.”
Negative claim limitations are adequately supported when the specification describes a reason to exclude the relevant limitation. Such written description support need not rise to the level of disclaimer. In fact, it is possible for the patentee to support both the inclusion and exclusion of the same material. The claim limitation that the Phillips formulations contain no sucralfate is adequately supported by statements in the specification expressly listing the disadvantages of using sucralfate. The district court’s holding that the '772 patent claims are invalid on written description grounds is thus reversed. Because the lack of written description for the “no sucralfate” limitation was the district court’s only reason for concluding that the '772 patent claims cannot claim priority to the application that issued as the'737 patent, we also reverse this holding. As a result, the '772 patent claims are entitled to claim priority to the '737 patent, which thus cannot be used as prior art against them.
B. Obviousness — 35 U.S.C. § 103
The primary issue on appeal is whether a solid dosage form of non-enteric coated PPI such as omeprazole would have been obvious to one of ordinary skill in the art. A patent is invalid for obviousness “if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.” 35 U.S.C. § 103(a). “Obviousness is a question of law, which we review de novo, with underlying factual questions, which we review for clear error following a bench trial.” Honeywell Int’l, Inc. v. United States, 609 F.3d 1292, 1297 (Fed.Cir.2010). These underlying factual inquires are: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the field of the invention; and (4) objective considerations such as commercial success, long felt need, and the failure of others. KSR Int’l Co., v. Teleflex, Inc., 550 U.S. 398, 406, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007) (citing Graham v. John Deere Co., 383 U.S. 1, 17-18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)). Patent invalidity must be established by clear and convincing evidence. *1352 Microsoft Corp. v. i4i Ltd. P’ship, — U.S. -, 131 S.Ct. 2238, 2242, 180 L.Ed.2d 131 (2011).
The district court held that the asserted claims would have been obvious over several pieces of prior art. The scope and content of the prior art applicable to each asserted claim, however, differs depending on the claim’s effective filing date. Due to breaks in the chain of priority, Santarus is unable to claim an early enough priority date to preclude use óf Dr. Phillips’s own '737 patent as prior art for some of the asserted claims. In a thorough analysis of priority, the district court determined that the '737 patent is prior art to claims 26, 37, 38, 49, 50, 66, 68, and 80-82 of the '346 patent and the asserted claims of the '885 patent, '988 patent, and '772 patent. Santarus, 720 F.Supp.2d at 436-37. Santarus appeals the court’s priority determination only as to the '772 patent (and as described above, we reverse), and does not contend that the district court erred by finding that the '737 patent was prior art to the other claims. Accordingly, Santarus waived any argument that the '737 patent is not prior art to the other claims. See Advanced Magnetic Closures, Inc. v. Rome Fastener Corp., 607 F.3d 817, 833 (Fed.Cir.2010). The asserted claims thus fall into one of two categories depending on whether the '737 patent is prior art, and our validity analysis must proceed on this basis.
1. Claims to Which the '737 Patent is Prior Art
The district court correctly held that the '737 patent would have rendered obvious all claims to which it is prior art. Santarus, 720 F.Supp.2d at 452. The '737 patent is prior art to: claims 26, 37, 38, 49, 50, 66, 68, and 80-82 of the '346 patent; claims 2, 9, 11, 15-18, and 41 of the '885 patent; and claim 29 of the '988 patent.
The '737 patent discloses formulating omeprazole both in conventional dosage forms (e.g., tablets, capsules, and granules) and also as an aqueous suspension of omeprazole with a buffering agent. For example, the '737 patent discloses treating gastrointestinal conditions by administering:
A pharmaceutical composition for making a solution/suspension of omeprazole ... includes omeprazole ... and a bicarbonate salt of a Group 1A metal in a form for convenient storage whereby when the composition is dissolved in aqueous solution, the resulting solution is suitable for enteral administration.
'737 patent at [57].
The '737 patent discloses an example of such a suspension, which is formed by mixing enteric coated omeprazole particles with a solution of water and sodium bicarbonate. Id. col.8 11.6-41. Importantly, however, the '737 patent teaches that the omeprazole does not need to be enterically coated. '737 patent col.8 11.18-22 (“In a preferred embodiment of the present invention, enterically-coated omeprazole particles are obtained from delayed release capsules (Astra Merck) additionally omeprazole powder can be used.” (emphasis added)). Even when examples use enteric coated omeprazole, the '737 patent teaches that the sodium bicarbonate suspension “dissolves the enteric coating” and emphasizes that “[i]t is important ... that the enteric coated pellets of omeprazole must be allowed to completely breakdown in the suspension vehicle or carrier prior to administration.” Id. col.8 11.21-28. The '737 patent- also teaches that “[t]he omeprazole or other substituted benzimidazoles and derivatives thereof and bicarbonate can be formed into a tablet, capsules, or granules, by methods well known to those skilled in the art.” Id. col.10 11.29-33. While the prior art before the '737 patent taught away from tablets, capsules, and granules *1353 with non-enteric coated PPI, the '737 patent expressly teaches these formulations. The '737 patent thus discloses a solid dosage form within the meaning of the asserted claims.
Santarus designates claims 2 and 17 as exemplary of the asserted claims of the '885 patent. These claims depend from independent claim 1, which recites:
A method of treating a gastric acid related disorder in a subject in need thereof, comprising:
providing a solid pharmaceutical composition for oral administration to the subject, the composition consisting essentially of: (a) a therapeutically effective amount of at least one acid labile, substituted benzimidazole H+, K+-ATPase proton pump inhibitor; (b) at least me buffering agent in an amount of about 0.1 mEq to about 2.5 mEq per mg proton pump inhibitor; and (c) one or more optional pharmaceutically acceptable ex-cipients, wherein at least some of the proton pump inhibitor is not enteric coated and the solid pharmaceutical composition has a total buffering agent to total proton pump inhibitor weight ratio of greater than 20:1; and orally administering the pharmaceutical composition to the subject, wherein upon oral administration of the pharmaceutical composition to the subject, an initial serum concentration of the proton pump inhibitor greater than about 0.1 |xg/ml is obtained at any time within about SO minutes after administration of the composition..
'885 patent claim 1 (emphases added). Claim 2 additionally requires an initial serum concentration “greater than about 0.15 |xg/ml at any time within about 30 minutes after administration of the composition.” Id. claim 2. Claim 17 also requires that the buffering agent be sodium bicarbonate “in an amount from about 1000 mg to about 2000 mg.” Id. claim 17.
Santarus makes three arguments with regard to the '885 patent claims: (1) they require an uncoated PPI and buffer in specific amounts and ratios not disclosed in the prior art; (2) they achieve the desired results using only 1000 mg to 2000 mg of sodium bicarbonate; and (3) they achieve specific blood serum concentration levels not disclosed in the prior art.
Santarus is incorrect that the '737 patent fails to disclose non-enteric coated PPIs and buffer within the claimed ratios. The '737 patent discloses broad ranges for the amounts of omeprazole and sodium bicarbonate that can be used, which overlap with the range of ratios of buffering agent to PPI claimed in the '885 patent. For example, the '737 patent teaches that the amount of sodium bicarbonate can vary between 0.75 mEq to 1.5 mEq per 2 mg of omeprazole (0.375 to 0.75 mEq per mg of omeprazole). '737 patent col. 10 11. 15-19. This falls within the range of about 0.1 mEq to about 2.5 mEq of buffering agent per mg of PPI claimed in the '885 patent. Sodium bicarbonate weighs roughly 84 mg/ mEq, see Santarus, 720 F.Supp.2d at 441, and thus the range of buffering agent taught in the '737 patent equates to a weight ratio of buffering agent to PPI of greater than 20:1 (i.e., 31.5-63 mg of sodium bicarbonate per mg of PPI), as required by the claims.
The '737 patent also discloses claim 17’s limitation that the buffering agent be sodium bicarbonate “in an amount from about 1000 mg to about 2000 mg.” The '737 patent teaches that the dosage range of non-enteric coated omeprazole can vary from approximately 2 mg/day to 100 mg/ day. '737 patent col.9 11.9-13. Because the ratio of sodium bicarbonate to PPI disclosed in the '737 patent ranges from 0.75 mEq to 1.5 mEq per 2 mg of omeprazole, the '737 patent teaches a range of 0.75-75 mEq of sodium bicarbonate. This range *1354 equates to about 63-6300 mg of sodium bicarbonate, which overlaps with the claimed range of 1000-2000 mg.
Santarus is also incorrect that the claims reciting specific blood serum concentrations of PPI would have been nonobvious. The initial blood serum concentration resulting from administering a PPI dosage is an inherent property of the formulation, and an obvious formulation cannot become nonobvious simply by administering it to a patient and claiming the resulting serum concentrations. See, e.g., In re Kao, 639 F.3d 1057, 1070 (Fed.Cir.2011) (“[The prior art’s] express teachings render the claimed ... formulation obvious, and the claimed [blood concentration] adds nothing of patentable consequence.”). To hold otherwise would allow any formulation — no matter how obvious — to become patentable merely by testing and claiming an inherent property. There is no dispute that the blood serum concentrations claimed in the '885 patent are expected in light of the dosages. In fact, a publication by Pilbrant and Cederberg entitled “Development of an oral formulation of omeprazole” (Pilbrant) includes a blood serum chart that indicates that the claimed levels are easily achieved within the first thirty minutes after administration of a suspension of non-enteric coated omeprazole buffered with sodium bicarbonate. J.A. 1315-16.
Santarus does not designate any of the other claims to which the '737 patent is prior art as being exemplary, nor does Santarus identify any other specific limitations that are not disclosed in the prior art. We thus hold that the district court correctly determined that claims 26, 37, 38, 49, 50, 66, 68, and 80-82 of the '346 patent, claims 2, 9, 11, 15-18, and 41 of the '885 patent, and claim 29 of the '988 patent would have been obvious.[2]
2. Claims to Which the '737 Patent is Not Prior Art
The '737 patent is not prior art to claims 58-60 of the '346 patent or to the asserted claims of the '882 and '772 patents. For these claims, the two most relevant pieces of prior art are the Pilbrant reference and an article by Lamers et al. entitled “Absorption of omeprazole in Zollinger-Ellison syndrome is accelerated by alkali” (Lamers), J.A. 1464-65. The district court held that Pilbrant and Lamers each individually render obvious every asserted claim. Santarus, 720 F.Supp.2d at 449.
The parties raise several issues relating to these prior art references. They dispute whether, at the time of the Phillips invention, the prior art taught away from the use of non-enteric coated oral dosage forms of PPIs. The parties also disagree as to whether Pilbrant and Lamers teach certain limitations of the asserted claims and whether objective evidence justifies a finding of nonobviousness.
a. Teaching Away — The Solid Oral Dosage Limitation
A reference “teaches away” when it “suggests that the line of development flowing from the reference’s disclosure is unlikely to be productive of the result sought by the applicant.” Medichem, S.A. v. Rolabo, S.L., 437 F.3d 1157, 1165 (Fed. Cir.2006) (quoting In re Gurley, 27 F.3d 551, 553 (Fed.Cir.1994)). Whether a prior art reference teaches away from the claimed invention is a question of fact. Para-Ordnance Mfg., Inc. v. SGS Imps. Int'l, Inc., 73 F.3d 1085, 1088 (Fed.Cir. 1995).
Santarus argues that the prior art, particularly Pilbrant, taught away from the claimed invention. Specifically, Santarus *1355 contends that the dosing regimen Pilbrant discloses for suspensions of buffered nonenteric coated omeprazole was so complex that it would discourage a person of ordinary skill in the art from pursuing such formulations. Santarus argues that this, coupled with the fact that Pilbrant expressly “ruled out” non-enteric coated tablets, capsules, and granules, would discourage a skilled artisan from using any nonenteric coated oral dosage forms of PPIs.
Santarus is partly correct. Pilbrant teaches that the options for formulating omeprazole are limited because it is minimally soluble in water but degrades rapidly in the acidic environment of the stomach. J.A. 1313. Pilbrant discusses four options: 1) solutions; 2) suspensions of buffered non-enteric coated omeprazole; 3) conventional oral dosage forms — tablets, capsules or granules — with nonenteric coated PPIs; and 4) conventional oral dosage forms with enteric-coated PPIs. J.A. 1313-14. Pilbrant states that the fourth option, conventional dosage forms with enteric-coated PPIs, “offers the best possibilities.” J.A. 1314. Pilbrant explicitly “ruled out” the third option — non-enteric coated conventional oral dosage forms such as tablets, capsules, or granules — because they degrade too quickly in the stomach to be absorbed in sufficient amounts to be effective. J.A. 1313. This disclosure would discourage a person of ordinary skill in the art from pursuing conventional oral dosage forms such as tablets, capsules, or granules with non-enteric coated PPIs, and thus teaches away from such formulations. As a result, we hold that the district court erred by concluding that claims directed to such conventional dosage forms would have been obvious over Pilbrant or Lamers. We thus reverse the court’s obviousness holding with respect to claims 4, 5, 8, 10, 12, 14, and 15 of the '772 patent, which all are directed to conventional dosage forms, such as tablet or capsules, containing non-enteric coated PPIs.[3]
Santarus is incorrect, however, that the prior art taught away from all non-enteric coated omeprazole formulations. The district court broadly construed the claim terms “solid pharmaceutical composition in a dosage form” and “solid oral pharmaceutical dosage form” as “including a powder that can be combined with an aqueous medium then orally administered.” J.A. 300. As a result of these undisputed constructions, many of the asserted claims cover powder formulations for use in aqueous suspensions. The prior art does not teach away from such powder formulations.
As the district court found, “[t]he Lamers and Pilbrant references teach that uncoated omeprazole formulations containing a sodium bicarbonate buffer could be used as an alternative to enteric coating in order to protect omeprazole from degrading in the stomach.” Santarus, 720 F.Supp.2d at 448-49 (emphasis added). Although Pilbrant “ruled out” conventional dosage forms such as tablets, capsules, or granules with non-enteric coated PPIs, it states that a “rapidly dissolving suspension of micronized omeprazole is the second best choice as the reference formulation.” J.A. 1315 (emphasis added). As Par’s expert testified, Pilbrant also teaches that such buffered suspensions using nonenteric coated omeprazole have a similar effect on gastric acid secretion as enteric coated omeprazole without bicarbonate. J.A. 1316; J.A. 1130-31.
Pilbrant thus teaches that, although suspensions of buffered non-enteric coated *1356 omeprazole may be the “second best choice,” they are a viable alternative to enteric coating. “A statement that a particular combination is not a preferred embodiment does not teach away absent clear discouragement of that combination.” Syntex (U.S.A.) LLC v. Apotex, Inc., 407 F.3d 1371, 1380 (Fed.Cir.2005). Describing a formulation as “second best” is not a “clear discouragement,” as is required by our precedent.
Nor do we see any merit to Santarus’s contention that the dosing regimen Pilbrant discloses for suspensions of buffered non-enteric coated omeprazole was so complex that it taught away from such formulations. Pilbrant teaches that a total of 40 mmoles of sodium bicarbonate should be given with 250 mL of water in five divided doses after a ten-hour overnight fast. J.A. 1315. The district court did not clearly err by declining to find that this regimen, which basically requires dissolving less than half a teaspoon of sodium bicarbonate in just over a cup of water, is such a strain on patient compliance as to teach away from using a buffered suspension of nonenteric coated omeprazole. Santarus, 720 F.Supp.2d at 447-48.
Thus, Pilbrant discloses, and does not teach away from, “a powder that can be combined with an aqueous medium then orally administered.” For the claims that are broad enough to include this powder (i.e., those not limited to tablets, capsules, or granules), the solid pharmaceutical dosage limitation is taught by Pilbrant.
b. Other Claim Limitations
The thrust of this appeal is whether the prior art discloses the claimed nonenteric coated solid pharmaceutical dosage forms. In cursory form, Santarus argues a limited number of additional limitations that it alleges are not present in the prior art, such as the claimed amounts and ratios of PPI and buffer. We conclude that the district court was correct that claims 58-60 of the '346 patent and claims 12 and 27 of the '882 patent would have been obvious over Pilbrant.
Santarus contends that Pilbrant and Lamers fail to teach a dosage with PPI and buffer in the amounts and ratios recited in claim 60 of the '346 patent, which Santarus designated as an exemplary claim. Claim 60 of the '346 patent depends from claim 57, which recites:
A solid pharmaceutical composition in a dosage form that is not enteric-coated, comprising: active ingredients consisting essentially of:
(a) a therapeutically effective amount of a non-enteric coated proton pump inhibitor selected from the group consisting of omeprazole, lansoprazole, rabeprazole, esomeprazole, pantoprazole, pariprazole, and leminoprazole, or an enantiomer, isomer, derivative, free base, or salt thereof; and
(b) a buffering agent selected from the group consisting of sodium bicarbonate, and calcium carbonate, in an amount more than about 40 times the amount of the proton pump inhibitor on a weight to weight basis in the composition.
'346 patent claim 57. Claim 60 further requires that the buffering agent be sodium bicarbonate in an amount of at least 800 mg. Id. claim 60.
As the district court found, Pilbrant discloses administering approximately 3360 mg of sodium bicarbonate with 60 mg of omeprazole, a ratio of 56:1 on a weight to weight basis. See Santarus, 720 F.Supp.2d at 447. Pilbrant thus teaches the limitation of using an amount of buffer “more than about 40 times the amount of proton pump inhibitor on a weight to weight basis.” Pilbrant’s use of 3360 mg of sodium bicarbonate also meets claim 60’s limitation of using “at least about 800 *1357 mg” of sodium bicarbonate. Pilbrant similarly teaches using PPI and buffering agent in the amounts and ratios recited in claims 58-59 of the '346 patent and claims 12 and 27 of the '882 patent. Thus we find no merit in the arguments related to these claims.
Exemplary claims 20 and 21 of the '772 patent, however, require amounts of buffering agent not disclosed in the prior art. Claim 20 requires 2-25 mEq of sodium bicarbonate buffer while claim 21 requires 4-25 mEq of sodium bicarbonate. '772 patent claims 20, 21. Pilbrant discloses using 40 mEq (3360 mg) of sodium bicarbonate, which is significantly more than the amount claimed in the '772 patent. J.A. 1315. Par appears to contend that, because Pilbrant and Lamers both teach the claimed ratio of sodium bicarbonate to PPI, it would have been obvious to a person of ordinary sMll in the art to reduce the total amount of sodium bicarbonate buffer disclosed in those references. See, e.g., Cross-Appellant’s Br. 19-20. Par, however, failed to establish this by clear and convincing evidence. Pilbrant states that the purpose of consuming sodium bicarbonate with the omeprazole solution was to “buffer the pH of the gastric content to neutral values.” J.A. 1315. Par points to nothing in the prior art that indicates it was the ratio of buffering agent to PPI, as opposed to the total amount of buffer consumed, that was the key to preventing the stomach from being too acidic. Given the prior art’s teachings regarding protecting omeprazole from stomach acid, we hold that it would not have been obvious to a person of ordinary skill in the art to decrease the amount of sodium bicarbonate disclosed in Lamers or Pilbrant.
Likewise, the required amount of buffering agent in claims 11 and 15 of the '882 patent are not disclosed by Pilbrant or Lamers. Claim 11 requires an amount of buffering agent of about 15-30 mEq. '882 patent claim 11. Claim 15 requires about 12.5-30 mEq of sodium bicarbonate buffer. Id. claim 15. As a result, we reverse this portion of the district court judgment and hold that Par did not establish by clear and convincing evidence that these claims would have been obvious over Pilbrant or Lamers.
c. Objective Considerations
Santarus argues that the district court’s fact findings regarding objective evidence were clearly erroneous. Santarus cites the testimony of its expert Dr. Fennerty that skepticism in the industry, unexpected results, long-felt need, industry recognition, and commercial success support a holding of nonobviousness. Appellant’s Br. 50-53. Santarus also cites a statement by researcher Dr. George Sachs expressing his skepticism that Zegerid® would work. Id. at 11-12. The district court, however, reviewed all of the secondary consideration evidence and concluded that:
The evidence in the record on several relevant secondary considerations does not undermine the court’s finding that the patent is obvious in light of the prior art. On the contrary, the weight of the evidence as to the relevant secondary considerations confirms the court’s finding in this regard.
Santarus, 720 F.Supp.2d at 453. The court expressly found that there was no commercial success. Id. at 453-55. For example, the court found that sales of Zegerid® were dwarfed by those of other PPIs and “fell far short of Santarus’ own expectations.” Id. at 453-54. The court also rejected Santarus’s arguments with respect to the other objective factors. Id. at 455-59. For example, the district court found the statement by Dr. Sachs unpersuasive for several reasons, including that Dr. Sachs was not a witness at trial and *1358 thus was not subject to cross examination. Id. at 456. The district court’s findings of fact are entitled to deference, and Santarrus failed to show that they are clearly erroneous. See, e.g., Para-Ordnance Mfg., Inc., 73 F.3d at 1091. We thus hold that Santarus’s objective evidence is insufficient to overcome the obviousness of the claims over Pilbrant. We thus affirm the district court’s conclusion that claims 12 and 27 of the '882 patent and claims 58-60 of the '346 patent would have been obvious over Pilbrant and reverse the court’s holding that claims 11 and 15 of the '882 patent claims 20 and 21 of the '772 patent would have been obvious.
IV. Summary
In view of the foregoing, we affirm the district court’s ruling that Par failed to establish inequitable conduct. We also affirm the court’s determination that the following claims would have been obvious over the prior art: claims 12 and 27 of the '882 patent; claims 26, 37, 38, 49, 50, 58-60, 66, 68, and 80-82 of the '346 patent; claims 2, 9, 11, 15 — 18, and 41 of the '885 patent; and claim 29 of the '988 patent. We reverse the district court’s ruling that the asserted claims of the '772 patent and claims 11 and 15 of the '882 patent would have been obvious. We also reverse the district court’s holding that the claims of the '772 patent are invalid for lack of written description. We remand for further proceedings consistent with this opinion.
AFFIRMED-IN-PART, REVERSED-IN-PART, and REMANDED

. Santarus, Inc. v. Par Pharm., Inc., 720 F.Supp.2d 427 (D.Del.2010).

. For the same reasons discussed in section 2.c., infra, the district court's fact findings regarding objective considerations are not clearly erroneous.

. Claims 4 and 5 of the '772 patent are not expressly limited to a tablet or capsule dosage form, but require specific pharmaceutical ex-cipients (disintegrants and lubricants) that are commonly used in conventional dosage forms such as tablets, not in powder formulations.