NEWMAN, Circuit Judge, dissenting.
The court today holds that the new Acorda treatment for multiple sclerosis, Ampyra®, achieved after decades of failed research, was obvious. For this discovery, where a relatively small pharmacological difference produced long-sought medical benefits, it is essential that the correct law and analysis of obviousness are applied.
The district court observed that the objective indicia, viz. commercial success, long-felt but unmet need, failure of others, and copying, could change the result, yet discounted its weight on the theory that the patentee had a "blocking" patent. Adopting this flawed reasoning, my colleagues hold that this new treatment for multiple sclerosis was obvious. However, it is apparent that there is not clear and convincing evidence of obviousness.
The consequences of this new legal theory are large, as the amici curiae advise.
*1343 Had the court's approach to the law of obviousness been in effect when Acorda took up the study of 4-aminopyridine after decades of failures by others, it is questionable whether this new treatment for multiple sclerosis would have been discovered and pursued. The loser is the afflicted public.[1]
From my colleagues' continuation of this error, and their erroneous conclusions, I respectfully dissent.
I
The Decades of Failures
As the court reports, 4-AP has "for several decades" been the "focus of research regarding the treatment of multiple sclerosis." Maj. Op. at 1315. Starting in the 1980s or earlier, scientists in several countries tried and failed to provide safe and effective application of 4-AP. My colleagues agree, as do the Defendants who initiated these Hatch-Waxman proceedings, that the Acorda Patents describe novel technology, and that a safe and effective formulation for 4-AP was not previously known. The Acorda inventors succeeded where many others had failed. The panel majority treats these past failures simply as invalidating prior art.
The court recognizes that the Acorda Patents are directed to a new, effective treatment to relieve the "walking impairment" of multiple sclerosis.[2] However, the court holds that Acorda merely "add[ed] further, more specific requirements to the Elan Patent's claimed methods." Maj. Op. at 1314. The court does not mention that Elan, after years of failures, abandoned its attempts to use 4-AP to treat multiple sclerosis and licensed the sustained-release patent to Acorda.
The record shows that many scientists in many institutions studied and eventually abandoned 4-AP as a treatment prospect for multiple sclerosis. These abandoned studies constitute the prior art on which the district court and my colleagues rely for obviousness of the Acorda Patents. However, the experimentation with 4-AP shows just the opposite - it shows that work with 4-AP was abandoned due to the inability to balance the compound's potential effectiveness with its toxicity.
To review obviousness of the Acorda Patents, I start with the cited references, whose chronology illustrates the initial encouragement followed by failed attempts to apply the neurological properties of 4-aminopyridine, and the eventual abandonment of this product despite some positive observations.
A. The Stefoski Study
In 1987, Stefoski et al. reported a one-day test of the effects of 4-AP on vision and gait in twelve multiple sclerosis patients.[3] They reported that, following intravenous injection of 7 to 35 mg of 4-AP, in 1 *1344 to 5 mg doses every ten to sixty minutes, "[v]ision improved in 7 patients, oculomotor function in 5, and motor function (power, coordination, gait) in 5," stating that there were "no serious side effects," and "transient therapeutic benefit in selected patients." Stefoski et al. at 71. My colleagues rely on this publication for rendering obvious Acorda's improvement in walking, while downplaying the "serious side effects" including seizures reported by Bever[4] and others, and the criticism of the small sample size and the brief duration of these one-day tests.
B. The Davis Study
In 1990, Davis and Stefoski reported a study of fifteen patients using an orally-administered formulation of 4-AP.[5] They concluded that the results "suggest a safe and effective therapeutic window for orally administered 4-AP," but they cautioned that similar studies had found that side effects of 4-AP "precluded its clinical use," and that "MS patients have an increased risk of seizures." Davis et al. at 191.
These studies were criticized by Bever as "limited because they did not use a randomized treatment design, were not double blinded, and relied on outcome measures that were not widely accepted." Bever II at S119. Although my colleagues cite Davis' reports of "mild to marked improvements," Maj. Op. at 1315, they do not mention the risk of seizures as warned by Davis, or Bever's criticisms.
While the panel majority states that Davis reported "no serious or bothersome side effects, including seizures" at doses up to 25 mg, id. , Elan, which relied on Davis' research team, Dist. Ct. Op. at *4, terminated its development of 4-AP based on toxicity and seizures, and licensed its sustained release patent to Acorda. Nonetheless, my colleagues hold that the Davis studies contributed to the obviousness of the Acorda Patents, ignoring the problems that were reported, and the abandonment of 4-AP by these researchers.
C. The Van Diemen study
The panel majority also relies on a study conducted in the Netherlands and published in 1993 by Van Diemen.[6] The publication reports the effect of escalating doses of 4-AP, measured by the Kurtzke expanded disability status scale (EDSS) that is frequently used as a benchmark to measure symptoms in multiple sclerosis patients. The study examined the effect on eye function of intravenous and oral administration of 4-AP for up to 12 weeks.
My colleagues report that eye functioning was benefited, but ignore the report of side effects, including nausea and dizziness, at the "escalated" dosages needed to produce improvement in eye function. Van Diemen et al. at 200, 203.
D. The Polman study
Polman[7] describes an unblinded study of the treatment with 4-AP of thirty-one *1345 multiple sclerosis patients, some of whom had been involved in an earlier study. Twenty-three patients were treated with 4-AP for longer than six months. The new patients were given an upward titration dosing plan in accordance with the tolerability by the patient, up to a maximum dose (based on patient weight) over four to eight weeks. Polman measured efficacy based on subjective reports from the patients during clinic visits.
The Van Diemen and Polman references were relied on by the district court as teaching "stable dosing," but they involve stable dosing only after titration to the highest tolerable dose for each individual patient. Both Van Diemen and Polman describe using a titration scheme up to the maximum amount based on the patient's weight. Dist. Ct. Op. at *12-13. These references only teach stable dosing after the maximum tolerable dose has been determined for each patient, after upward titration. Goodman, post , also reports an "increasing benefit" for doses up to 50 mg/day if such doses can be tolerated. These sources all show the understood need to target higher doses to the extent they can be tolerated. See Goodman Poster (reporting increasing benefit as dosage was increased from 20mg to 50mg).[8]
Polman reported that "[i]mprovements in fatigue and ambulation were mentioned quite often by the patients." Polman et al. at 295. However, two patients in the Polman study experienced seizures and discontinued participation. Id. at 294-5. My colleagues cite Polman's report of "favorable response to the medication," Maj. Op. at 1316 (citing id. at 293), but downplay Polman's conclusion that there was little quantifiable benefit of the therapy using the primary EDSS benchmark, my colleagues stating that the side effects were not troublesome, despite the reports of seizures. Maj. Op. at 1316-18.
E. Additional studies reported by Bever
The Bever II reference reports additional studies, as follows:
Two double-blind, placebo-controlled crossover trials of DAP have recently been completed. Carter and associates, using 3-week treatment periods and doses up to 80 mg/day, found subjective improvement in 48% of patients on DAP but only 24% on placebo. Although this difference was not statistically significant, treatment-related differences were found in sensitivity to thermal challenge.
Bever II at S120 (citing JL Carter et al., A double-blind, placebo-controlled crossover trial of 3,4-diaminopyridine in the symptomatic treatment of multiple sclerosis , 34 Annals of Neurology 272 (1993) ).
These studies further illustrate the uncertain state of the art at that time, and the "differences" and "sensitivity" that led to abandonment of development of 4-AP. These studies did not lead to any proposed treatment of multiple sclerosis, despite the accumulating knowledge concerning 4-AP. My colleagues mention the toxic effects including seizures, encephalopathy, and *1346 hepatitis, but skip over their importance. However, it is apparent that others did not ignore their importance, for no proposed product, no proposed treatment, resulted from these studies.
F. The abandoned Elan studies
The manifestations and miseries of multiple sclerosis are powerful, and Elan Corporation entered the field to pursue the idea that sustained-release formulations of 4-AP might relieve the toxic effects and provide "therapeutically effective blood levels throughout a given treatment period." U.S. Patent No. 5,540,938 (the "Elan Patent") at col.2, l.15. In 1991 Elan filed the patent application leading to the Elan Patent, which described and claimed sustained-release formulations of 4-AP. Elan undertook major efforts to develop a treatment for multiple sclerosis using sustained-release formulations. Reports of these unsuccessful efforts were published.
Schwid[9] reports a failed clinical trial in 1994, described as a six-week, 161-patient placebo-controlled study of the administration of sustained-release 4-AP to multiple sclerosis patients. The results were measured using the EDSS benchmark, and included measures of walking disability including gait and speed. The conclusion was that there was no improvement over the placebo. Schwid et al. at 817.
Another Elan study of ten patients, also reported by Schwid, stated that nine of these patients showed an improvement in speed of walking. Schwid discussed that the mean serum level of 4-AP during the study was "65±25 ng/ml (range, 34-99)" and that the treatment "appeared particularly efficacious in subjects who achieved serum 4AP levels above 60 ng/ml." Id. at 819-20. The study reported that "[n]one of the patients with a serum level less than 60 ng/ml felt better (according to their global impressions) on 4AP SR [sustained-release] than placebo," while all patients with serum levels above 60 ng/ml demonstrated improvement in timed gait, grip strength, and five of six improving by their own subjective impression. Id. at 819-20. In contrast, the Acorda Patents are directed to a serum range of about 15-35 ng/ml, which Schwid described as unlikely to produce therapeutic effect.
The 17.5 mg dose used by Schwid was stated to be ineffective in a number of respects, including the EDSS benchmark. Schwid et al. at 817. Schwid suggested that further research should be conducted, but this does not convert Schwid's reported failures into a teaching of the path to success. My colleagues state that Schwid reported "promising" results, Maj. Op. at 1343, but do not mention Schwid's conclusion that 4-AP was not effective at the doses that were necessary to limit toxicity, or the lack of improvement over placebo. Instead, my colleagues suggest that Schwid contributed to obviousness because Schwid suggested that, since the EDSS benchmark had failed, it might be useful to look at "more sensitive, quantitative measures." Maj. Op. at 1319-20 (quoting Schwid, J.A. 6681). Thus the panel majority concludes that these studies rendered obvious the Acorda success that had eluded Schwid.
Elan also sponsored studies at the University of Maryland, published by Bever et *1347 al.[10] Bever summarized that the "lower serum concentration range of 30 to 59 ng/ml may ... be adequate for inducing improvement of some neurologic deficits," Bever I at 1058, quoted at Maj. Op. at 1318; but the panel majority ignores that the study did not show any improvement on the EDSS benchmark or on an ambulation benchmark, id. at 1056-57, and treats the Bever report of "increased side effects," including a grand mal seizure, as a throwaway, Maj. Op. at 1318.
These studies surely added to the body of knowledge, but they did not produce a usable product. Although these studies used Elan's sustained-release formulations, the effort was eventually abandoned. The record is consistent in showing that Elan, like the others who had studied 4-AP, had been unable to achieve an effective product free of toxicity and serious side effects.
G. The Hayes report of early Acorda studies
Hayes[11] reports Acorda's activity, starting in 1993 and investigating use of 4-AP for treatment of spinal cord injury. The first of these studies evaluated single doses of sustained-release 4-AP in fourteen patients with spinal cord injury, and the second study examined multiple doses of sustained-release 4-AP in sixteen patients with spinal cord injury. Dist. Ct. Op. at *15 (citing Hayes et al. at 186). The Hayes publication stated that all patients in both studies experienced at least one adverse event, such as dizziness, hypotension, or nausea. Hayes et al. at 188, 191.
H. The Solari review article
Solari[12] is a review of medical knowledge related to 4-AP, including reports on clinical trials conducted with MS patients. From the studies in its analysis, Solari tabulated that 54% of the multiple sclerosis patients taking 4-AP or diaminopyridine experienced improved motor functions, compared to 7% of placebo. Solari et al., J.A. 7204. Solari concluded that its "review of trials found there is not enough evidence about the safety of these drugs or whether benefits are certain." Solari et al., J.A. 7218.
II
The Acorda Studies
As outlined supra, Acorda began research with 4-AP in 1993 for treatment of spinal cord injury. As reported by Hayes, successful results were not obtained. Dr. Ron Cohen, the founder of Acorda, turned to study of multiple sclerosis. Dr. Cohen testified that he took on the "daunting challenges" of seeking an effective treatment for multiple sclerosis, with knowledge of the failures of Elan and others. Appellant's Br. at 13 (citing J.A. 596-97).
Acorda scientists conducted research over the ensuing six years, and published their results as experience accumulated *1348 and knowledge evolved. These publications are treated as prior art to the Acorda Patents.
A. Acorda's initial failures
Acorda's initial publications reported that the multiple sclerosis population receiving various experimental 4-AP treatments showed some improvement in walking speed and lower extremity muscle strength, but "did not show that any individual dosage had a statistically significant effect versus placebo." Appellant's Br. at 15; see Goodman Poster, n.9 ante . Dr. Goodman was the lead clinical investigator for Acorda, and the lead author for the published results of Acorda's MS-F201 study,[13] a randomized double-blind placebo-controlled study with the aim of "determin[ing] the safety and tolerability of escalating doses of a sustained-release ('SR') formulation given orally to patients with MS." Goodman I at S116.
Goodman I states that the MS-F201 data "showed statistically significant improvement from baseline compared to placebo in functional measures of mobility (timed 25 walking speed; p=0.04) and lower extremity strength (manual muscle testing; p=0.01)." Id. at S117. It further states that "[d]ose response curves showed increasing benefit in both measures in the 20 to 50 mg/day range." Id. However, two participants withdrew due to seizures. Id.
The Goodman Poster reported that the MS-F201 study demonstrated "statistically significant improvements in the timed 25-foot walk and manual muscle test relative to placebo." Dist. Ct. Op. at *15. However, the Poster also stated that a greater improvement in fatigue was reported by the placebo group as compared to the 4-AP treated group, and referred to the withdrawal of two subjects due to seizure. Goodman Poster, J.A. 6502. Dr. Goodman testified at trial that "[a]ll of the prespecified analyses failed except for the lower extremity manual muscle test." J.A. 604 (289:24-5). He stated that the result of the timed walk "was not at all significant," and was consistent with the failed Elan study. J.A. 605 (290:5).
The district court found that the Goodman Poster established that "the use of a 10 mg sustained-release dose of 4-AP twice per day to treat walking in MS patients would have been obvious to a POSA at the priority date of the Acorda Patents." Dist. Ct. Op. at *33. Acorda states that "the district court's conception that the Goodman Poster teaches anything about a 10 mg BID dose of 4-AP as the sole individual dose of an MS treatment protocol-as opposed to merely the starting point of an escalating dosing scheme-is impermissible hindsight." Appellant's Br. at 38. Acorda is correct that the Goodman Poster does not suggest this low-dose formulation with a reasonable expectation of success, but reports increasing benefit as dosage was increased from 20 to 50 mg.
Acorda correctly states that the Elan work and these initial Acorda studies show, if anything, that 4-AP treatment requires upward titration to determine the maximum tolerable dose for individual patients since efficacy can only be achieved at higher doses, and that these studies do not provide any reason to believe that a low dose would be effective. Goodman I reported an "increasing benefit in both *1349 measures in the 20-50 mg/day range," referring to mobility and lower extremity strength. Goodman I at S117.
In 2003, Acorda conducted a 206-patient clinical study, designated MS-F202. The study employed upward titration to successively higher doses, starting at dosages of 10 mg of sustained-release 4-AP twice-daily. The highest tolerable dose was then continued for 12 weeks. It was concluded that no treatment group showed improvement over placebo, over the 12-week testing period. Dist. Ct. Op. at *9.
The low dose protocol developed by Acorda is not suggested in the prior art. Although the goal was a stable dose without individual titration, no study, no reference reported successful results using the low dose of the Acorda Patents, or even suggested that it should be tried. The panel majority's contrary theory is devoid of support.
B. Acorda's analytical breakthrough
Acorda analyzed the MS-F202 results, focusing on "patients in the study who, after treatment, showed a 'meaningful difference' from their before-treatment baseline-i.e. the 'responders,' " and learned that the therapeutic effect of 4-AP did not increase with increase in dosage, as prior reports and Acorda's own research had suggested. Appellant's Br. at 19. Dr. Cohen testified that they "were extremely surprised" because "[e]verything that we had come to expect throughout the program told us that we should be seeing more and more efficacy the higher the dose went as long as the patients were tolerating it and that turned out not to be the case." J.A. 614 (299:5-9). This contradicted the teachings of all of the earlier studies. Only the courts find it obvious.
Acorda then conducted additional clinical studies at the lower dosages, and established that a twice-daily sustained-release 10 mg dose produced improvement in walking gait and speed, while avoiding the toxicity and seizures of higher dosages. Acorda filed a provisional patent application on April 9, 2004, directed to this treatment. Acorda continued its studies, and after a total of twelve years of investigation and development, Acorda in 2010 obtained FDA approval for a product for improving the walking impairment in multiple sclerosis patients. This product has the brand name Ampyra®. The Acorda Patents are directed to and limited to the twice-daily administration of 10 mg doses of sustained-release 4-AP formulation.
The district court, affirmed by my colleagues, held the Acorda Patents invalid on the ground of obviousness. The district court ruled that the evidence of long-felt need, failure of others, unexpected results, and commercial success are irrelevant because the Elan Patent was a "blocking" patent. However, the Elan Patent did not block research on 4-AP, did not block other possible treatments for multiple sclerosis, and did not affect the Defendants' development and copying and Hatch-Waxman challenge to the Elan and Acorda patents. The court's theory of "blocking" is unrelated to whether the Acorda product meets a long-felt need in treating multiple sclerosis, for the Elan and Acorda patents do not block the Defendants from developing a competitive treatment for multiple sclerosis. The patents that support Acorda's eventual success do not block others from using and learning from Acorda's teachings, experimenting with and comparing with Acorda's product, and engaging in competitive activity.
III
The District Court's Analysis
The Defendants conceded infringement, and the district court found the Acorda *1350 Patents invalid on the ground of obviousness. The district court determined that four claim elements were common to the Acorda Patents, then found that each of these elements is present in a separate reference, and held that a person of ordinary skill in this field would obviously have selected and combined these elements to produce the Acorda product and method.
The district court did not find any motivation or suggestion in the prior art as to which elements to select and combine, and did not find any teaching or suggestion that such selection and combination would be likely to succeed in treating the walking impairment of multiple sclerosis. Acorda attributes the district court's rulings to "hindsight bias" and incorrect statements of law by the Defendants. Indeed, without the hindsight knowledge of Acorda's success, there is no teaching or suggestion of this selection and combination or its likelihood of success.
A. The selected claim elements
The district court selected four aspects of the Acorda claims, as follows: (1) the use of 4-AP to improve walking in multiple sclerosis patients; (2) the use of a 10 mg twice-daily sustained release dose; (3) the use of stable dosing without upward titration; and (4) the specific pharmacokinetic parameters achieved. The court concluded that "a POSA would have been motivated to combine these limitations with a reasonable expectation of success." Dist. Ct. Op. at *29.
However, the question is not whether these four elements, if combined, would produce a successful treatment. The question is whether the prior art contains a suggestion or motivation to select these four elements from the decades of inconclusive prior art, with a reasonable expectation that the selection would eliminate the failures of the prior art. See, e.g., In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig. , 676 F.3d 1063, 1068-69 (Fed. Cir. 2012) ("a party seeking to invalidate a patent as obvious must 'demonstrate "by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so." ' " (quoting Procter & Gamble Co. v. Teva Pharms. USA, Inc. , 566 F.3d 989, 994 (Fed. Cir. 2009) ) ) ); In re Kubin, 561 F.3d 1351, 1359 (Fed. Cir. 2009) (prior art does not provide a reasonable expectation of success where the art may suggest "vary[ing] all parameters or try[ing] each of numerous possible choices until one possibly arrived at a successful result, where the prior art gives either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful.") (quoting In re O'Farrell , 853 F.2d 894, 903 (Fed. Cir. 1988) ) ). The years of studies and failures weigh heavily against the simplistic post hoc predictability accepted by the court.
The district court analyzed the purported obviousness of each of the four limitations, as follows.
1. Improvement in walking
The district court found that several references showed improved walking upon treatment with 4-AP. The court framed the question as whether a POSA would have "a reasonable expectation that 4-AP could be successfully used as claimed to treat (i.e., achieve therapeutically-effective blood levels in) even a single patient."
*1351 Dist. Ct. Op. at *30. The court referred to Schwid's analysis of the early Acorda studies as showing "a statistically significant improvement in ... timed gait, which was found to be improved in nine out of 10 patients, in comparison to the placebo group." Id.
However, the early Acorda studies all stated concern about toxicity, particularly seizures, at the dosages that these studies showed were needed to obtain relief. No witness suggested that these early studies taught or suggested that a low dosage formulation would be effective.
2. The dosage of 10 mg twice daily
The district court concluded that this dosage was an obvious choice, because the prior art evaluated doses ranging from 10 mg to 80 mg. Dist. Ct. Op. at *32. However, the prior art contains no suggestion, indeed no hint, that a 10 mg twice-daily sustained-release formulation would be effective. All of the early references demonstrated the need for upward titration, showing that higher doses are needed for efficacy, with individual titration to determine the highest tolerable dose before seizures occurred. The district court cited the Goodman Poster as showing that toxicity increased at higher dosages, and as providing "[e]vidence of dose-response in [the] 20-40 mg/day range." Dist. Ct. Op. at *32. However, the studies reported by Goodman did not provide a safe and efficacious product, but depended on individual titration to establish individual dosages at the highest tolerable level.
The district court held that it was obvious to use the 10 mg dose, despite the general showing of ineffectiveness of the 10 mg dose. Dist. Ct. Op. at *33. It is not disputed that the general teaching was that doses higher than 10 mg were needed for therapeutic effect. It cannot reasonably be viewed as obvious that a dosage that was described in the prior art as ineffective, is in fact the optimum dosage.
3. Stable dosing without upward titration
The district court found that the prior art, particularly the Van Diemen and Polman references, taught the use of uniform dosing of 4-AP, and "included reports of safe and effective long-term use of stable dosing of immediate-release 4-AP." Dist. Ct. Op. at *34. The district court further found that the prior art's "consistent use of titration ... did not undermine the other evidence in the prior art that supports finding that a POSA would have had a reasonable expectation of success with stable dosing." Id . Only hindsight can construct the Acorda formulation from these inapt teachings, for the references cited by the district court require upward titration to select the highest tolerable dose, for low stable doses were ineffective.
The panel majority, seeking to fill this gap, asserts that "[t]he prior art is not limited to titrated dosing," Maj. Op. at 1331, citing Polman and Schwid. However, Polman involved titration, and reported that therapeutic doses required in excess of 40 mg for minimal quantifiable benefit. See Polman et al. at 295 (stating that the reported improvements generally did not result in significant changes to the EDSS benchmark). In addition, Schwid suggested the need for a far higher dose, only maintained stable dosing for a week, and did not report meaningful success in treating multiple sclerosis. Schwid et al. at 817.
4. Pharmacokinetic limitations
For the fourth limitation, the district court found that the claimed pharmacokinetic *1352 serum levels were disclosed by Hayes, for "[i]t is undisputed that the Hayes researchers used the Ampyra® formulation in their study." Dist. Ct. Op. at *35. The district court considered Acorda's argument that "there is nothing in the prior art identifying the pharmacokinetic values recited in the claims as being effective to improve walking or increase walking speed in MS patients," id. , and found that "a POSA would have been aware that a sustained-release dosage form achieving the pharmacokinetic parameters disclosed in Hayes III would have been associated with an improvement in walking in MS patients." Dist. Ct. Op. at *36.
The Defendants argue that even if the serum level in the Acorda Patents is not obvious based on the Hayes reference, the claimed range is inherent in the dosage of 4-AP, citing Santarus, Inc. v. Par Pharm., Inc. , 694 F.3d 1344, 1354 (Fed. Cir. 2012), where the court held that reciting the blood serum concentration resulting from a dosage form did not impart patentability to known dosage forms. Acorda responds that the prior art did not teach or suggest that any specific blood serum levels would improve walking in multiple sclerosis patients. No such teaching or suggestion appears anywhere in the record. Hayes does not relate its serum analysis to efficacy in improving gait or walking speed in persons afflicted with multiple sclerosis.
The district court referred to Acorda's statement at trial, that "[i]t was known in the art that a sustained release formulation of 10 megs BID could achieve" the claimed pharmacokinetic values. Dist. Ct. Op. at *35 n.39 (citing J.A. 1108-1109). The district court found that there was a reasonable expectation of success with regard to the pharmacokinetic parameters because these parameters are inherent in the claimed dosing. Id. The court did not find, and the prior art does not establish, that this pharmacokinetic range was known to have a beneficial effect on walking speed and gait in persons afflicted with multiple sclerosis.
B. The combination of elements
The district court found a reasonable expectation of success on combination of the four claim elements, stating that "a POSA would consider 10 mg/twice daily to be among the finite group of doses of sustained-release 4-AP that could reasonably be expected to improve walking in MS patients," Dist. Ct. Op. at *33. The court concluded that:
Defendants have adduced clear and convincing evidence that a POSA at the priority date would have been motivated and would have had a reasonable expectation of success to practice and combine each of the limitations of the asserted claims of the Acorda Patents.
Dist. Ct. Op. at *40.
Acorda is correct that there was no suggestion in the prior art that the claimed combination should be tried, and there is no hint of a reasonable expectation of success. Acorda points to the decades of failure of others to develop a safe and effective treatment for multiple sclerosis using 4-AP, despite its known toxicity. The district court's selection of separate limitations from separate sources, and retrospectively fitting them into the Acorda template, is achieved only with the hindsight knowledge of Acorda's eventual success. See Sanofi-Synthelabo v. Apotex, Inc. , 550 F.3d 1075, 1086 (Fed. Cir. 2008) ("The determination of obviousness is made with respect to the subject matter as a whole, not separate pieces of the claim.").
*1353 Here, only the Acorda Patents teach the combination that successfully treats this multiple sclerosis impairment while avoiding toxicity and seizures.
Acorda's path to successfully harness the neurological benefits of 4-AP eluded the many scientists studying multiple sclerosis. Although the district court acknowledged the known adverse effects of 4-AP including seizures, Dist. Ct. Op. at *41 (stating that "the Court agrees with Plaintiffs that, at the priority date of the Acorda Patents, the risk of seizures loomed over the work of exploring the use of 4-AP in MS"), nonetheless the court found that a person of ordinary skill would have had a reasonable expectation of success with the Acorda product. The recognized need for a stable, non-toxic dosage protocol does not render the solution obvious if it is eventually discovered. The record does not show any teaching or suggestion of success of the formulation in the Acorda Patents.
Nor does the record support a finding of "obvious to try." Such a finding requires that a person of ordinary skill would not only have selected these specific elements from various discarded experiments, but also "would have had a reasonable expectation of success in doing so." Pfizer, Inc. v. Apotex, Inc. , 480 F.3d 1348, 1361 (Fed. Cir. 2007). It is clear that the prior art does not provide a reasonable expectation of success of the Acorda Patents' specific dosage and protocol.
IV
The Objective Indicia of Unobviousness
The objective indicia "may often be the most probative and cogent evidence in the record .... It is to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art." Stratoflex, Inc. v. Aeroquip Corp. , 713 F.2d 1530, 1538-39 (Fed. Cir. 1983). The district court, affirmed by the panel majority, err in discounting the undisputed evidence of commercial success, long-felt need, failure of others, unexpected results, and copying.
The district court discussed the objective indicia, and concluded that they did not "outweigh" the conclusion of obviousness. The district court found that Ampyra® could be considered a commercial success "[g]iven the strength of Ampyra®'s sales, and the absence of any evidence that its sales are disappointing given its limited indication and patient population." Dist. Ct. Op. at *38. However, the court concluded that this commercial success did not weigh heavily because "no one other than the Elan patentees and their licensees could have practiced the invention of the Acorda Patents without facing liability for patent infringement." Id.
Commercial success is measured against the products available for the same purpose, not against infringing copies of the patented product. Defendants do not contend that they are precluded from providing or developing other treatments for multiple sclerosis. The Acorda product met a long-felt need, for which the failure of others, despite decades of experimenting with the neurological properties of 4-AP, is evidence of the unobviousness of the Acorda achievement. Such evidence is an important aid to a court that is attempting to divine whether the patentee's discovery was obvious in accordance with law.
Concerning failure of others, the panel majority states that Elan's failure "is not particularly relevant to the expectation of success." Maj. Op. at 1334-35. This is a peculiar conclusion, for Elan had undertaken an immense investment, including clinical *1354 trials, in the hope that its extended-release concept would solve the problems encountered by others. Elan eventually gave up. Nonetheless, my colleagues find that Acorda's success was obvious to them.
The district court and my colleagues also misapply the concept of "blocking patent," and hold that because a patent provides the right to exclude infringers, the indicia of commercial success, long-felt need, failure of others, and copying are diminished. However, as the Pharmaceutical Research and Manufacturers of America, as amicus curiae, reminds us, "a prior patent would not have categorically precluded others from further developing the technology," pointing to the statutory safe harbor of § 271(e)(1), the knowledge provided in the patents, and the right to conduct research on patented subject matter. Br. of Amicus Curiae at 4.
The objective indicia of unobviousness are measured against the state of the science and in the commercial context. Here the unexpected success and its human benefits are not disputed. The district court was advised that the Patent Trial and Appeal Board sustained the validity of the Acorda Patents in inter partes review, at Coalition for Affordable Drugs (ADROCA), LLC v. Acorda Therapeutics, Inc., 2017 WL 950736 (P.T.A.B. Mar. 9, 2017). Although the majority reports this event, as did the district court, its consequences are not explored, including issues of privity, estoppel, and finality.
CONCLUSION
Obviousness of the Acorda Patents was not established by clear and convincing evidence. The prior art did not provide a suggestion to select the specific elements and limitations of the Acorda formulation, and did not suggest that such selection and combination would have a reasonable expectation of success in relieving the walking impairment of multiple sclerosis. From my colleagues' contrary holding, I respectfully dissent.

The FDA gave the Acorda product expedited approval, in view of the public need for relief of multiple sclerosis. Appellant's Br. at 23.

The symptoms of multiple sclerosis include "walking impairment, visual difficulty, fatigue, bladder dysfunction, tingling or pain, sexual dysfunctions, balance problems, and cognitive changes," with "weakness in the legs and/or alterations in walking among the most common symptoms." Acorda Therapeutics, Inc. v. Roxane Labs., Inc. , No. 1:14-cv-00882-LPS, 2017 WL 1199767 (D. Del. Mar. 31, 2017) (Dist. Ct. Op. at *2 ).

Dusan Stefoski et al., 4-Aminopyridine Improves Clinical Signs in Multiple Sclerosis , 21 Annals of Neurology 71 (1987), J.A. 6697.

Christopher T. Bever, Jr., The Current Status of Studies of Aminopyridines in Patients with Multiple Sclerosis , 36 Annals of Neurology S118 (1994) ("Bever II"), J.A. 6172.

Floyd A. Davis et al., Orally Administered 4-Aminopyridine Improves Clinical Signs in Multiple Sclerosis , 27 Annals of Neurology 186 (1990), J.A. 6327.

Harriët A. M. Van Diemen et al., 4-Aminopyridine in Patients with Multiple Sclerosis : Dosage and Serum Level Related to Efficacy and Safety , 16 Clinical Neuropharmacology 195 (1993), J.A. 7037.

Chris H. Polman et al., 4-Aminopyridine in the Treatment of Patients with Multiple Sclerosis , 51 Archives of Neurology 292 (1994), J.A. 6654.

Dist. Ct. Op. at *14 ("The Goodman Poster is a poster presented at the September 2002 annual meeting of the America Committee for Treatment and Research in Multiple Sclerosis, held in Baltimore, Maryland."), J.A. 6497-504.

Steven R. Schwid et al., Quantitative assessment of sustained-release 4-aminopyridine for symptomatic treatment of multiple sclerosis , 48 Neurology 817 (1997), J.A. 6681-84.

Christopher T. Bever, Jr. et al., The effects of 4-aminopyridine in multiple sclerosis patients: Results of a randomized, placebo-controlled, double-blind, concentration-controlled, crossover trial , 44 Neurology 1054 (1994) ("Bever I"), J.A. 6180.

Keith C. Hayes et al., Pharmacokinetic Studies of Single and Multiple Oral Doses of Fampridine-SR (Sustained-Release 4-Aminopyridine) in Patients With Chronic Spinal Cord Injury , 26 Clinical Neuropharmacology 185 (2003), J.A. 6433.

Alessandra Solari et al., Aminopyridines for symptomatic treatment in multiple sclerosis (Review) , Cochrane Database of Systematic Reviews, Issue 4 (2002), J.A. 7204.

Andrew Goodman et. al., Placebo-Controlled Double-blinded Dose Ranging Study of Fampridine-SR in Multiple Sclerosis, 8 Multiple Sclerosis S116 (P308) (July 2002), ("Goodman I") J.A. 6370.